**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMAAL BROWN, | : | |
| | : | Civil No. 05-5279 (NLH) |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | **O P I N I O N** |
| LYDELL SHERRER, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Jamaal Brown, <u>Pro</u> <u>Se</u>
Northern State Prison
#420645/241124C
168 Frontage Road
Newark, NJ 07114

Linda K. Danielson
Deputy Attorney General
Office of the NJ Attorney General
Appellate Bureau
P.O. Box 086
Trenton, NJ 08625
Attorney for Respondents

**HILLMAN, District Judge**

Petitioner, Jamaal Brown, filed the within petition for a

Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254.[1]

Respondents filed a Response to the Petition on May 17, 2006.

---

[1]  Petitioner's name was incorrectly docketed as "Jamal
Brown."  The Clerk of the Court will be ordered to amend the
docket to reflect the correct spelling of Petitioner's name as
"Jamaal Brown."

The Court has considered all submissions.  For the reasons set
forth below, the Petition will be denied.

## BACKGROUND

### 1.   Factual Background

The facts of this case were recounted below and this Court,
affording the state court's factual determinations the
appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply
reproduce the Superior Court of New Jersey, Appellate Division's
("Appellate Division") factual recitation:

> At trial, the following evidence was produced for
> the jury's consideration.  On December 30, 1998, Jamaal
> and his co-defendant Mikeal Brown ("Mikeal") went to an
> apartment shared by the twenty-six year old victim
> ("K.D."), and her boyfriend Keith Jones ("Jones"), in
> search of Jones who Jamaal and Mikeal believed had
> stolen drugs from them.  They persistently banged on
> the door, asking for Jones, and telling K.D. to open
> the door.  After K.D. told them that Jones was not home
> and asked them to leave, Jamaal and Mikeal kicked open
> the door and began to search the apartment looking for
> Jones, while K.D. repeatedly told them that Jones was
> not home.
>
> After they realized that Jones was not home,
> Jamaal told K.D. to come over to where he stood in the
> front bedroom.  K.D. refused and again stated that
> Jones was not home.  Jamaal insisted that K.D. come
> anyway.  Mikeal, who was still standing by the door,
> told K.D. to do as Jamaal said because he was crazy and
> would hurt her.  K.D. complied and walked over to where
> Jamaal stood.  Jamaal then told her to get on her
> knees.  When K.D. refused, Jamaal shoved her by her
> shoulders to her knees.  He then forced K.D. to perform
> oral sex on him, while he held her hair.  After K.D.
> complained that her knees were hurting, Jamaal told her
> to get up and pushed her toward another bedroom, where
> he told her to bend over.  He then vaginally penetrated
> K.D.

Jamaal then invited Mikeal who was still standing
guard in the living room to come and let K.D. "do him."
Mikeal came into the bedroom, laid on the bed, grabbed
K.D.'s hair, shoved her head down, and forced her to
perform oral sex on him.  He shoved K.D.'s head down so
hard that K.D. began to choke, at which time K.D. heard
Mikeal say he did not care whether she choked or not.
Mikeal continued to force K.D.'s head down and the
choking became so bad that K.D. vomited on the bed.
Both Jamaal and Mikeal warned K.D. not to contact the
police.

Jones returned to the apartment to find the front
door bolted.  He entered the apartment through a window
because he did not have his key.  As he entered the
apartment, Jamaal and Mikeal grabbed him, threw him
against the wall, searched him and accused him of
stealing their drugs.  Jones asked K.D. if she was okay
but K.D. did not respond.  Jones was then forcibly
removed from the apartment ostensibly to look for the
missing drugs.  After they left, K.D. ran to a friend's
house to call her mother, who then contacted the
police.  K.D.'s mother and her boyfriend subsequently
arrived and took K.D. to West Jersey Hospital, where
she was diagnosed with a cervical strain from her head
being "jerked."  She was then taken to Cooper Hospital
where a rape kit was performed.  Semen was found on
K.D.'s right inner thigh and on her lips.  The examiner
found redness on K.D.'s left shoulders that appeared to
be from fingerprints.  She also found swelling and
redness on both knees, redness on her mid-thigh area,
redness and bruising on her underarm, and swelling and
purplish bruises on K.D.'s lips.

Photographs of K.D.'s cervix revealed severe
bruising on multiple areas, dark redness, swelling, and
tenderness.  K.D. also sustained stage four bruising,
the most severe type of bruising to her cervix.  K.D.'s
injuries were found to be consistent with injuries
sustained in a sexual assault because her muscles
tightened in an attempt to resist the assault.

Based on the statement given by K.D. and Jones, on
January 7, 1999, Jamaal and Mikeal were arrested.
Mikeal testified at trial that K.D. willingly opened
the door and engaged in sexual intercourse with both he
and Jamaal in exchange for drugs.  At the conclusion of
trial, Jamaal was found guilty of two counts of second-

degree sexual assault, a lesser included offense of
aggravated sexual assault.

(State v. Brown, A-6825-00T4 (Apr. 3, 2003), pp. 2-5;
Respondents' Exhibit "R" 4).

2.   Procedural History

On June 21, 1999, a Camden County Grand Jury indicted
Petitioner and his co-defendant on four counts, including: first-
degree aggravated sexual assault by Jamaal Brown against K.D.,
contrary to N.J.S.A. 2C:14-2a(3) and N.J.S.A. 2C:14-2a(5) (counts
one and two); first-degree aggravated sexual assault by Mikeal
Brown against K.D., contrary to N.J.S.A. 2C:14-2a(3) and N.J.S.A.
2C:14-2a(5) (count three); and second-degree burglary by Jamaal
and Mikeal Brown, contrary to N.J.S.A. 2C:18-2 (count four).

For six days during the time between January 31 and February
9, 2001, Jamaal and Mikeal Brown were tried jointly before a jury
in the Superior Court of New Jersey, Law Division, Camden County
("Law Division").  The jury found Petitioner Jamaal Brown guilty
of two counts of second-degree sexual assault (as a lesser-
included offense of first-degree aggravated sexual assault) on
counts one and two.  Co-defendant Mikeal Brown was convicted of
second-degree sexual assault (as a lesser-included offense of
first-degree aggravated sexual assault) on count three.  Both
defendants were acquitted of the burglary charge in count four.

On June 1, 2001, Petitioner appeared for sentencing.  Upon
the State's motion, the sentencing judge found that the

4

provisions of New Jersey's "No Early Release Act" ("NERA"),
N.J.S.A. 2C:43-7.2, applied to Petitioner's sexual assault
convictions.  Petitioner was sentenced to eight years
incarceration, with an 85% parole disqualifier under NERA for the
sexual assault on count two.

Petitioner appealed his convictions and sentence to the
Appellate Division.  On April 3, 2003, Petitioner's convictions
and sentence were affirmed.  Petitioner petitioned the New Jersey
Supreme Court for certification, which was denied on July 14,
2003.  See State v. Brown, 177 N.J. 492 (2003)(Table).

On September 9, 2003, Petitioner filed a pro se petition for
post-conviction relief ("PCR") in the trial court.  Counsel filed
a petition on Petitioner's behalf on July 23, 2004.  A non-
evidentiary hearing was conducted on October 29, 2004, and the
PCR motion was denied.

On May 26, 2005, the Appellate Division affirmed the denial
of the PCR petition.  On September 29, 2005, Petitioner's
petition for certification to the New Jersey Supreme Court was
denied.  See State v. Brown, 185 N.J. 267 (2005)(Table).

The instant petition was filed on November 7, 2005.  On
December 13, 2005, Petitioner was advised of his rights pursuant
to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000).  On May 17,
2006, Respondents filed an Answer and the state court record.

## DISCUSSION

### A.    Petitioner's Claims.

Petitioner asserts the following arguments for habeas relief, which have been summarized by this Court as follows:

1.    Conviction was obtained by action of the petit jury which was unconstitutionally selected and impaneled.
2.    Denial of effective assistance of trial and appellate counsel.
3.    Prosecutorial misconduct.
4.    Denial of right to trial by jury.
5.    Excessive sentence and sentencing errors.

See Petition for Writ of Habeas Corpus, ¶ 12 and attachment.

Petitioner has raised the instant claims before the New Jersey state courts.  To the extent that any of the claims are not exhausted, this Court exercises its discretion to decide them on the merits, in accordance with 28 U.S.C. § 2254(b)(2).

### B.    Standards Governing Petitioner's Claims.

Section 2254 of Title 28, United States Code, provides that the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts.  See

6

Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied 534
U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir.
1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a
writ of habeas corpus.  The statute reads as follows:

> (d) An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary
>> to, or involved an unreasonable application
>> of, clearly established Federal law, as
>> determined by the Supreme Court of the United
>> States; or
>>
>> (2) resulted in a decision that was based on
>> an unreasonable determination of the facts in
>> light of the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the
Supreme Court explained the application of § 2254(d)(1).  The
Court analyzed subsection 1 as two clauses:  the "contrary to"
clause and the "unreasonable application" clause.  The Court held
that under the "contrary to" clause, "a federal court may grant
the writ if the state court arrives at a conclusion opposite to
that reached by [the Supreme] Court on a question of law or if
the state court decides a case differently than [the Supreme]
Court has on a set of materially indistinguishable facts."  Id.
A federal court may grant the writ under the "unreasonable

application" clause, if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Habeas relief may not be granted under the "unreasonable application" clause unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief. See id. at 411; see also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir.), cert. denied, Matteo v. Brennan, 528 U.S. 824 (1999). Thus, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. See Werts, 228 F.3d at 197; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

     With regard to 28 U.S.C. § 2254(d)(2), a federal court must confine its examination to evidence in the record. See Abu-Jamal v. Horn, 2001 WL 1609690, at *12 (E.D. Pa. December 18, 2001). In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations. See id. Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the

8

state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Court
of Appeals for the Third Circuit has ruled that this presumption
of correctness can be overcome only by clear and convincing
evidence.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.
2001)(citing 28 U.S.C. § 2254(e)(1)).  "A finding that is well-
supported and subject to the presumption of correctness is not
unreasonable."  Abu-Jamal, 2001 WL 1609690 at *12 (citing Duncan,
156 F.3d at 198).

     Furthermore, federal habeas courts ordinarily refrain from
revisiting credibility determinations as "it would be wholly
inappropriate for a federal court to repastinate soil already
thoroughly plowed and delve into the veracity of the witnesses on
habeas review."  Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir.
2001).  A habeas petitioner therefore "must clear a high hurdle
before a federal court will set aside any of the state court's
factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98
(1st Cir. 2001).

     A pro se pleading is held to less stringent standards than
more formal pleadings drafted by lawyers.  See Estelle v. Gamble,
429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520
(1972).  A pro se habeas petition and any supporting submissions
must be construed liberally and with a measure of tolerance.  See
Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v.
Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United

States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert.
denied, 399 U.S. 912 (1970).

C.   **Jury Selection Claims**

Petitioner argues that the State excluded all males during
the jury selection process.  Defense counsel objected to the
State's use of peremptory challenges, and the trial court "failed
to acknowledge gender as a protected class."

During jury selection, defense counsel for both Petitioner
and his co-defendant conducted a side-bar conference with the
trial judge and prosecutor.  The following exchange occurred:

| | |
|---|---|
| MR. BOR:[2] | I'd like to go on the record that the defense one [sic] behalf of Jamaal Brown believes that the Prosecutor is systematically excluding all men on all their challenges. |
| MR. POLITTO: | I would concur, six out of six.  And in looking at the array, it's not – 9900 percent male – that it even [sic].  And now all six – all of the challenges she's – |
| MR. BOR: | All six out of six. |
| THE COURT: | Okay. |
| MR. POLITTO: | Keeping in mind the gender of the alleged victim and of the defendants. |
| THE COURT: | Okay, I'm not clear that – it– certainly a prosecutor's not allowed to exercise peremptory challenges to exclude people by race.  I'm not so clear that gender is a protected classification, but before I – |
| MR. BOR: | Well – |
| THE COURT: | – reach that issue, let me hear if Ms. Crafton has anything to say. |
| MS. CRAFTON: | Well, I would need to get my notes so that I could tell you why I struck them.  It wasn't because they're men, some of them it was |

_____

[2]  Mr. Bor represented Petitioner at trial.  Mr. Politto
represented co-defendant Mikeal Brown.  Ms. Crafton was the
prosecutor.

|  |  |
|---|---|
|  | because of their occupation, different factors and reasons not simply because someone's a man.  But I would need to look at my notes – |
| MR. BOR: | It may be Judge that it hasn't been recognized as such a class yet in our State, but certainly the underlying reasons why race has would apply similarly here, the gender is just as much an invidious discrimination, and – |
| THE COURT: | Unless you can tell me – |
| MR. BOR: | – this is a particular situation where having all the women jurors could be prejudicial to the defendants.  There's not a – |
| THE COURT: | That's hardly what we have in there right now. |
| MR. BOR: | I understand that, she's not finished with her challenges, we've had six out of six. |
| THE COURT: | Okay.  Well, unless you can tell me the name of the case that you rely on, I'm not going to conclude that it's a protected class.  I don't make the law, I follow the law that other higher courts establish. |
| MR. BOR: | I understand, it's just that – just so I go on the record – |
| THE COURT: | Is there any case that you're relying on? |
| MR. BOR: | No. |
| THE COURT: | Okay.  Well then I'll tell you what, we'll break right now and after lunch you can – or during lunch hour maybe I can ask you, Ms. Crafton, to review your notes and see if there's any comment that you wish to make on that. ... |

(R 16 at pp. 124-126).  After break, the judge asked the

prosecutor to explain her reasons for exercising her peremptory

challenges.  Although the prosecutor objected, the Judge

requested that she put her reasons on the record.  As to the six

jurors, the prosecutor stated that she utilized peremptory

challenges for the following reasons, as summarized by this

Court:

11

- The first juror was challenged due to his occupation and the fact that he did not have any children.
- The second juror was challenged due to his age, because he had a technical background, and because he had no children, and for his body language.
- The third juror was challenged because he had two sons and no daughters.
- The fourth juror was challenged because he was not married, had no children, and for his age.
- The fifth juror was challenged because he was "a little weird" and may have been "a little slow."
- The sixth juror was challenged because of his body language, a perceived demeaning attitude towards women, and because he had two sons and no daughters.

(R 16 at pp. 127-129). The trial judge decided that there would be no further argument on the matter, since she did not think that there was a basis for making the argument concerning the challenges. (R 16 at pp. 129-130).

At the conclusion of jury selection, defense counsel renewed the objection to the use of the prosecutor's peremptory challenges, citing State v. Gilmore, 103 N.J. 508 (1986). The following conversation occurred:

| | |
|---|---|
| MR. BOR: | . . . I'd like to . . . renew the objections I made earlier and [which were] denied by the Court, and rely on State v. Gilmore. |
| THE COURT: | Well, Gilmore is a case that deals with race. |
| MR. BOR: | Well, is [sic] also says class exclusion and I think that we can equate just as a course – that our equating a race as a class, also gender – |
| THE COURT: | Well, I'm not aware of anything which would suggest that white males are a protected class. And unless a Court says differently, I'm going to stick with my original ruling. There are currently three men on the jury, 11 women, and we'll proceed. Thank you. |

(R 16 at pp. 156-157).

12

Petitioner argued on direct appeal that the prosecutor impermissibly used her peremptory challenges to systematically and disproportionately remove members of a cognizable group from the petit jury.  The Appellate Division extensively examined this claim on direct appeal and disagreed.  (R 4 at pp. 5-13).  The Appellate Division noted that under both the state constitution and the federal constitution, the prosecution may not use peremptory challenges to exclude prospective jurors on the basis of gender.  (R 4 at p. 6, citing State v. Chevalier, 340 N.J. Super. 339, 347 (App. Div.), certif. denied, 170 N.J. 386 (2001) and J.E.B. v. Alabama, 511 U.S. 127, 128 (1994)).  The Appellate Division examined both the state constitutional law, and federal constitutional law, noting that the United States Constitution did not place as heavy a burden on the prosecution as the New Jersey Constitution to overcome a prima facie showing of use of peremptory challenges on constitutionally-impermissible grounds. (R 4 at p. 9, citing State v. Clark, 316 N.J. Super. 462, 469 (App. Div. 1998), certif. denied, 163 N.J. 10 (2000), and Purkett v. Elem, 514 U.S. 765, 767-68 (1995)).

The Appellate Division concluded:

> In setting forth his challenge to the prosecutor's use of her peremptory challenges, defense counsel stated that it was his belief that the prosecutor was "systematically excluding all men on all of [her] challenges."  That was the extent of the challenge raised by defendant.  Bare allegations are not enough. Jamaal had to "'establish that the potential jurors wholly or disproportionately excluded were members of a

cognizable group within the meaning of the
representative cross-section rule' and that 'there is a
substantial likelihood that the peremptory challenges
resulting in the exclusion were based on assumptions
about group bias rather than any indication of
situation-specific bias.'" Here, the jury, as selected,
was comprised of three men and eleven women.  On this
record, defendant did not meet his burden of making a
prima facie showing of a discriminatory purpose in the
prosecutor's exercise of her peremptory challenges.

(R 4 at p. 13)(citations omitted).

Peremptory challenges to exclude prospective jurors based on
gender violates the Equal Protection Clause of the Fourteenth
Amendment.  See J.E.B. v. Alabama, 511 U.S. 127, 130-131 (1994).
The three-part test to determine whether a peremptory challenge
is unconstitutionally based on race was set forth by the Supreme
Court in Batson v. Kentucky, 476 U.S. 79 (1986).  The three-part
test was extended to apply to peremptory strikes based on gender.
See J.E.B. v. Alabama, 511 U.S. 127 (1994); see also United
States v. DeJesus, 347 F.3d 500, 505-06 (3d Cir. 2003).   Thus,
in accordance with the three-part test enunciated in Batson,
first, a defendant must show that a peremptory challenge has been
exercised on the basis of gender.  Second, if that showing has
been made, the prosecution must offer a gender-neutral basis for
striking the juror in question.  Third, in light of the parties'
submissions, the trial court must determine whether the defendant
has shown purposeful discrimination.  See Batson, 476 U.S. at 96-
98; accord United States v. Milan, 304 F.3d 273, 281 (3d Cir.
2002).

14

As for the second prong of the <u>Batson</u> inquiry, "the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed [gender] neutral." <u>Purkett v. Elem</u>, 514 U.S. 765, 767-68 (1995)(citations omitted).

Additionally, as it pertains to habeas review, "[a] determination that a petitioner has shown intentional discrimination is a factual finding that we may not upset unless it is shown to be clearly erroneous." <u>Wilson v. Beard</u>, 426 F.3d 653, 668 (3d Cir. 2005)(citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003)).  The United States Supreme Court has stated:

> In the context of direct review, therefore, we have noted that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous.  A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system.  Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference.  Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.

<u>Miller-El</u>, 537 U.S. at 340 (internal citations omitted).

In this case, the Court finds no justifiable reason to second guess the trial court, considering the deference to be given to the state courts, and that the decision of the state

court is not objectively unreasonable in light of the evidence presented to state courts.  The prosecutor provided a gender-neutral explanation for exercising the peremptory challenges, which the trial court and Appellate Division accepted.  Moreover, the state courts applied the correct federal law to Petitioner's claims.  As such, Petitioner has not demonstrated that the actions of the state courts, which applied the proper federal law, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

**D.    Ineffective Assistance of Counsel Claims**

Petitioner argues that his trial counsel was ineffective, in violation of his Sixth Amendment constitutional rights, because: (1) counsel failed to investigate a witness with potentially exculpatory evidence; (2) counsel failed to call a medical expert to counter the testimony of the state's medical expert that the alleged victim's injuries were caused by non-consensual sexual acts; (3) counsel failed to establish a case of prosecutorial gender discrimination during jury selection; and (4) counsel failed to advise Petitioner that the ultimate decision whether or

16

not to testify was his to make.  Petitioner further argues that appellate counsel was ineffective "by neglecting to raise in proper context the denial of [Petitioner's] right to a trial by jury."  Petitioner argues that an evidentiary hearing was required to determine whether or not counsel was ineffective.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be
> highly deferential.  It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act

17

or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, petitioner must also show that counsel's substandard performance actually prejudiced his defense.  See Strickland, 466 U.S. at 687.  Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. See id. at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  See id. at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

18

The Supreme Court has held that the Due Process Clause of
the Fourteenth Amendment guarantees a defendant the effective
assistance of counsel on a first direct appeal as of right.
Evitts v. Lucey, 469 U.S. 387 (1985).  Claims of ineffective
assistance of appellate counsel are evaluated under the
Strickland standard.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d
Cir. 2004); Wright v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa.
July 26, 2004).  Appellate counsel does not have a duty to
advance every nonfrivolous argument that could be made, see Jones
v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may
establish that appellate counsel was constitutionally ineffective
"if he shows that counsel omitted significant and obvious issues
while pursuing issues that were clearly and significantly
weaker."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Moreover, in order to prevail on a claim that appellate
counsel was ineffective, a petitioner must show not only that
counsel's performance fell below an objective standard of
reasonableness, but also that there was a reasonable probability,
but for counsel's deficiency in raising the arguments on appeal,
that the conviction would have been reversed on appeal.  See
Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir.), cert. dismissed,
527 U.S. 1050 (1999).

Petitioner presented these ineffective assistance claims to
the state courts in his post-conviction relief motion.  The

19

Appellate Division, repeatedly citing <u>Strickland</u>, set forth the
standard to prove an ineffective assistance of counsel claim and
concluded as follows:

>      We turn next to defendant's four claims of
> ineffective assistance of trial counsel.  First, he
> claims counsel failed to investigate a known witness
> whose testimony allegedly would have supported the
> defense.  In addressing this argument, [the PCR judge]
> found that defendant's claims were vague, speculative,
> and lacked evidentiary support.  We agree.  Defendant
> failed to provide an affidavit from the proposed
> witness indicating what he would have said if he
> testified.  Thus, defendant has failed to demonstrate a
> reasonable probability that had the witness testified,
> the result of the proceeding would have been different
> so as to warrant a new trial.

>      Next, defendant claims counsel was deficient for
> failing to present a medical expert to refute the
> State's testimony concerning the victim's injuries.
> Again, defendant failed to provide an affidavit
> indicating what the expert would say.  For the same
> reasons we have just stated, the denial of that claim
> was proper because defendant did not demonstrate a
> reasonable probability that the proceeding would have
> been different had the medical expert testified.

>      Defendant claims counsel was ineffective for
> failing to properly establish a prima facie case of
> gender discrimination during jury selection.  We
> addressed that issue on direct appeal . . . .
> ... as we emphasized in our prior decision,
> defendant's challenge to the prosecutor's use of
> peremptory challenges was properly rejected by the
> trial court.  The jury was comprised of three men and
> eleven women.  Defendant's allegations that the State
> excluded members of a cognizable group are nothing more
> than assumptions on defendant's part and not supported
> by the factual record. ...

>      The final allegation concerning trial counsel's
> performance concerns defendant's claim that counsel led
> him to believe that only counsel could decide whether
> defendant could testify.  Defendant claims that had he
> been able to testify, he could have convinced the jury

> of the consensual nature of the sexual encounter with
> the victim.  Defendant's allegations, however, are
> belied by the record.

(R 11 at pp. 10-13)(citations omitted).  The Appellate Division

continued to cite the record wherein the trial judge instructed

the defendants regarding their right to take the stand.  After

the lengthy instruction, Petitioner stated that he did not need

anything the judge stated "re-explained."   (R 19 at pp. 156-158).

     The Appellate Division found Petitioner's claim that

appellate counsel was ineffective "by neglecting to raise in

proper context the denial of [Petitioner's] right to a trial by

jury," to also be without merit.  Although finding that the claim

was procedurally barred because it was previously addressed on

direct appeal, the Appellate Division noted:

> Even if, however, we were to decide the
> application without regard to procedural bar, we would
> still find defendant's arguments to be without merit.
> The two counts of second-degree sexual assault for
> which defendant was convicted required defendant's use
> of physical force or coercion.  The amount of physical
> force "as a NERA sentencing enhancement factor means
> the same as an element of the offense."  Here, the
> evidence clearly supports the requisite force necessary
> to convict defendant of the second-degree sexual
> assaults and to establish the NERA violent crime
> predicate.

(R 11 at pp. 9-10)(citations omitted).

     After a thorough review of the state court record, this

Court agrees with the reasoning of the state court utilizing the

correct federal Strickland standard for ineffective assistance of

counsel claims.  Counsel's performance cannot be said to be

21

"deficient" under the Strickland standard.  In fact, Petitioner
was convicted of lesser-included offenses due to counsel's
performance at trial in convincing the jury that first-degree
crimes were not proven beyond a reasonable doubt.

Nor has Petitioner demonstrated that the results of his
trial or appeal would have been different had his attorneys acted
some other way in defending him at trial and presenting his
appeal.  A review of the record reveals that the attorney
presented a solid defense with the facts he had before him.
Despite counsel's efforts, there was sufficient evidence
presented for the jury to examine and determine Petitioner's
guilt.

Petitioner has demonstrated neither that counsel's
performance was deficient, nor that the results of the trial or
appeal would have been different had the attorneys acted as
Petitioner now suggests.  As the state courts applied the correct
Strickland standard to Petitioner's claims and reasonably applied
the facts, Petitioner has not shown, as required by 28 U.S.C. §
2254(d), that the actions of the state courts "resulted in a
decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States," or "resulted in a
decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court

22

proceeding."   These grounds for a writ of habeas corpus, are
therefore denied.

**E.   Prosecutorial Misconduct Claims**

Petitioner argues that the prosecutor used the word
"coercion" in her closing argument "when that aspect of sexual
assault was irrelevant to this case."   Petitioner notes that the
trial judge removed the word "coercion" from the verdict sheet
without instructing the jury to disregard the prosecutor's
comment.

Petitioner's argument stems from a discussion after the
charge was read to the jury.   The following exchange occurred:

| | |
|---|---|
| THE COURT: | Okay.  Is there any objection to the charge as given so far other than what we've already dealt with at the charge conference? |
| MS. CRAFTON: | The only question I had, it could have been, it's just that I did not hear it, was with regard to the aggravated sexual assault, like the use of force or coercion and I wasn't sure if coercion – |
| MR. BOR: | It's not a coercion case at all. |
| THE COURT: | Coercion, you used the word coercion in your closing. |
| MR. BOR: | Yes, I did. |
| MS. CRAFTON: | Because it [sic] not on the verdict sheet. That's why I'm – |
| THE COURT: | Oh, it is? |
| MS. CRAFTON: | Yes, that's why I'm asking. |
| THE COURT: | Well, that needs to change too.  Oh, you're right.  No, coercion means threatening somebody with the loss of their job or it has really specific meanings under the law which are not pertinent here. |
| MR. BOR: | It's defined in a whole separate statute. |
| THE COURT: | It's a whole separate thing. |
| MR. BOR: | Threatening with their job, threatening with their livelihood. |

23

THE COURT:     Right.  So I will- I didn't use the word
               coercion in the charge because I knew that it
               did not apply, but it's on the verdict sheet,
               so let me change that.  All right, so I'll
               take it out. ...  And, therefore, for that
               reason I did not charge them on coercion
               because- just real briefly let me say what
               coercion means, it's in the statute.
               Coercion means where you threaten to inflict
               bodily injury on anyone or commit any
               offense, where you accuse anyone of an
               offense[,] exposes a secret which exposed
               them to hatred, contempt or really cruel
               [sic] or impairs their credit or business
               repute.  So, this is not a coercion case, so
               that's why I didn't charge them on coercion.
MS. CRAFTON:   It's just that I was reading the verdict
               sheet, as you know, you were going along.
THE COURT:     I'll go over it with the jury tomorrow.  I'll
               eliminate the reference to the word coercion.

(R 20 at pp. 198-200).

A review of the closing arguments does reflect that the
prosecutor used the word "coercion," as Petitioner suggests.
First, she mentioned: "One, they've already started the coercion.
The moment you kick somebody's door in, you already sent a
message to the people inside that house who is in control."  (R
20 at p. 135).  The prosecutor used the word "coercion" again as
she later continued: "Then what do we know?  They're now in her
house.  Mikeal Brown is standing by the door.  That right there
is the second method of coercion because now you're sending a
message to [K.D.], I'm standing by the door."  (R 20 at p. 136).

Under United States Supreme Court precedent, where a
prosecutor's opening or closing remarks are challenged in habeas,
"[t]he relevant question is whether the prosecutor's comments 'so

24

infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel. Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

In the instant case, the prosecutor's "coercion" comments were not so offensive as to infect the entire trial, violate due process, or render his conviction unfair.  This Court doubts that a jury comprised of laypeople would even realize the subtlety of the use of the word "coercion" during the summation; nor would the jury be able to apply the legal definition of "coercion" to the case.  Further, there was sufficient evidence to convict Petitioner, the credibility of which was weighed by the jury.  In light of the entire trial and with the evidence against Petitioner, including the victim's testimony and physical evidence, the Court is satisfied that the prosecutor's allegedly

offensive action by using the word "coercion" did not violate
Petitioner's right to a fair trial.

Additionally, the trial judge made clear in instructing the
jury that they were the trier of facts.  The trial judge charged:

> Regardless of what the attorneys have said or what
> I may have said in recalling the evidence in this case,
> remember that it is your recollection of the evidence
> that must and should guide you as judges of the facts.
> Remember also that arguments, statements, remarks,
> openings and closings by the attorneys are not evidence
> and must not be treated by you as evidence.  Although
> the attorneys may point out what they think is
> important in this case, you must rely only upon your
> understanding and your recollection of the evidence
> that was presented during the trial.

(R 20 at p. 148).   Thus, even assuming that the prosecutor's
remarks were improper, the judge's instruction was clear and
correct and prevented the prosecutor's remarks from so infecting
the trial with unfairness as to make the resulting conviction a
denial of due process.  Petitioner is not entitled to relief on
this claim.

**F.    Right to Trial by Jury Claims**

Petitioner argues that his constitutional rights were
violated when he was sentenced to consecutive terms, greater than
the presumptive term, including a discretionary bar, based upon
the fact of physical force, which was neither admitted by
Petitioner nor found by the jury.[3]

_____

[3]  The Court notes that Petitioner's argument is flawed, in
that the second-degree sexual assault of which Petitioner was
convicted does include an element of "physical force."   See

26

The Appellate Division examined this claim on appeal of the PCR motion and found:

> Essentially, defendant claims the United States Supreme Court's decision in <u>Blakely v. Washington</u> renders his eight-year terms excessive because the findings to support the sentence were not made by a jury. We disagree.
>
> So long as the sentence falls within a standard range provided by statute, the existence of aggravating factors need not be found by a jury. ... <u>see also</u> <u>United States v. Booker</u> . . . . Consequently, because the eight-year term imposed by the court on each count does not exceed the range established by statute for second-degree crimes, defendant's argument on this point is without merit.

(R 11 at pp. 14-15).

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 471, 490 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), the Supreme Court overturned a sentence imposed under Washington state's sentencing system, explaining that "the relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." 542 U.S. 296, 302 (2004) (internal quotations omitted). Most recently, in <u>United States v. Booker</u>, 543 U.S.

<u>N.J.S.A.</u> 2C:14-2c(1).

220 (2005), the Supreme Court applied the rule of Apprendi to the United States Sentencing Guidelines, holding that the Guidelines are not mandatory, but are merely advisory.

However, the rules announced in these cases are not applicable retroactively to cases on collateral review.  See generally In re Olopade, 403 F.3d 159 (3d Cir. 2005) (finding that the decision of the Supreme Court in Booker does not apply retroactively to cases on collateral review); United States v. Swinton, 333 F.3d 481 (3d Cir.), cert. denied, 540 U.S. 977 (2003) (holding that Apprendi does not apply retroactively to cases on collateral review); In re Turner , 267 F.3d 225 (3d Cir. 2001) (holding that Apprendi does not apply retroactively to cases on collateral review).  See also United States v. Price, 400 F.3d 844, 849 (10th Cir.), cert. denied, 126 S. Ct. 731 (2005) (Blakely does not apply retroactively to cases on collateral review).

In any event, it does not appear that the trial court violated the rule of Apprendi/Blakely.  Under federal law, the Supreme Court has held that judicial fact-finding in support of a sentencing judge's discretion to sentence within a statutory range does not violate the constitution.  See Booker, 543 U.S. at 233; Blakely, 542 U.S. at 308-09.  In this case, the trial court did not sentence Petitioner beyond the statutory maximum in

violation of Apprendi and Blakely.  Petitioner is not entitled to
relief on this claim.

## G.   Sentencing Claims

Petitioner argues that his sentence was manifestly
excessive.  Petitioner raised this argument on direct appeal.
The Appellate Division found that the sentence "is not manifestly
excessive or unduly punitive and does not constitute an abuse of
discretion.  Moreover, the trial judge appropriately applied the
guidelines for imposing consecutive sentences."  (R 4 at pp. 15-
16)(citations omitted).

A federal court's ability to review state sentences is
limited to challenges based upon "proscribed federal grounds such
as being cruel and unusual, racially or ethnically motivated, or
enhanced by indigencies."  See Grecco v. O' Lone, 661 F. Supp.
408, 415 (D.N.J. 1987) (citation omitted).  Thus, a challenge to
a state court's discretion at sentencing is not reviewable in a
federal habeas proceeding unless it violates a separate federal
constitutional limitation.  See Pringle v. Court of Common Pleas,
744 F.2d 297, 300 (3d Cir. 1984); see also  28 U.S.C. § 2254(a);
Estelle v. McGuire, 502 U.S. 62, 67 (1991); Lewis v. Jeffers, 497
U.S. 764, 780 (1990).

"The Eighth Amendment, which forbids cruel and unusual
punishments, contains a 'narrow proportionality principle' that
'applies to noncapital sentences.'"  Ewing v. California, 538

29

U.S. 11, 20 (2003) (citations omitted).  The Supreme Court has
identified three factors that may be relevant to a determination
of whether a sentence is so disproportionate to the crime
committed that it violates the Eighth Amendment:  "(1) the
gravity of the offense and the harshness of the penalty; (ii) the
sentences imposed on other criminals in the same jurisdiction;
and (iii) the sentences imposed for commission of the same crime
in other jurisdictions."  Solem v. Helm, 463 U.S. 277, 292
(1983).  More recently, Justice Kennedy has explained that Solem
does not mandate comparative analysis within and between
jurisdictions.  See Harmelin v. Michigan, 501 U.S. 957, 1004-05
(Kennedy, J., concurring in part and concurring in judgment).
Justice Kennedy identified four principles of proportionality
review--"the primacy of the legislature, the variety of
legitimate penological schemes, the nature of our federal system,
and the requirement that proportionality review be guided by
objective factors"--that "inform the final one:  The Eighth
Amendment does not require strict proportionality between crime
and sentence.  Rather, it forbids only extreme sentences that are
'grossly disproportionate' to the crime," Id. at 1001 (citation
omitted), quoted with approval in Ewing, 538 U.S. at 23.

     Here, Petitioner was convicted of two counts of second
degree sexual assault and was sentenced to two consecutive eight-
year terms of imprisonment, with an 85% period of parole

ineligibility.  Any sentencing error that may have occurred is a matter of state law and does not rise to a level of disproportionality that violates the Eighth Amendment.  As the sentencing issue raised by Petitioner is a matter of state law, and because the Court finds no constitutional violation, this claim must be denied.

### CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254 is denied.  The Court further finds that no certificate of appealability will issue because Petitioner has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253.

An appropriate Order accompanies this Opinion.



_____
NOEL L. HILLMAN
United States District Judge

Dated: September 18 2006

At: Camden, New Jersey

31